UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

---

JOSE LUIS SANTOS,

        Plaintiff,

  v.                                                           Case No. 16-cv-1362-pp

MARK R. KARTMAN,
and LORIE IVERSON,

        Defendant.

---

**DECISION AND ORDER GRANTING THE DEFENDANTS' MOTION FOR SUMMARY JUDGMENT (DKT. NO. 20) AND DISMISSING CASE**

---

      The plaintiff, who is representing himself, filed this case under 42 U.S.C. §1983, alleging that the defendants violated his constitutional rights. Specifically, he states that the defendants violated his right to equal protection under the Fourteenth Amendment by firing him from his kitchen job because he is Latino. The plaintiff further alleges that this firing violated his First Amendment rights, because it was in retaliation for his not telling the defendants what they thought he knew about a prison gang altercation when the plaintiff allegedly knew nothing.

      On June 23, 2017, the defendants filed a motion for summary judgment. Dkt. No. 20. The court will grant the defendants' motion and dismiss the case.

I.  **RELEVANT FACTS**[1]

Although listed as a white male in the Wisconsin Department of Corrections' centralized computer system, the plaintiff is a self-identified Latino. Dkt. Nos. 22 at ¶19; 32 at ¶19. His mother and father are from Puerto Rico and are Latino, and he points out that his name (Jose Luis Santos) is Latino. Dkt. No. 34 at ¶¶14, 15. He also asserts that he looks Latino. Id. at ¶21. During the relevant time, the plaintiff was an inmate at the Wisconsin Secure Program Facility (WSPF), where he had been assigned to work in the kitchen. Dkt. No. 22 at ¶¶1, 11.

Both defendants were employed at WSPF: defendant Mark Kartman was the security director and defendant Lorie Iverson was the food service administrator.  Id. at ¶¶3-4.

On May 21, 2016, the plaintiff and the other kitchen staff members were placed in temporary lock up status pending an investigation of a series of gang-related assaults in WSPF's kitchen, barbering area and units. Id. at ¶¶5-6, 20. The gang-related assaults involved two gangs: the Latin Folks (mostly Latinos) and the Vice Lords (mostly African Americans). Dkt. No. 34 at ¶¶5, 22.

As part of the investigation, the WSPF staff conducted numerous confidential interviews with the inmates. Dkt. No. 22 at ¶7. The plaintiff was one of the inmates interviewed. Id. at ¶10. When asked whether he had any

---

[1] The court takes the relevant facts from defendants' proposed finding of facts (dkt. no. 22), plaintiff's responses to defendants' proposed findings of fact (dkt. no. 32), plaintiff's proposed finding of facts (dkt. no. 34), and defendants' responses to plaintiff's proposed finding of facts (dkt. no. 39). Civ. L.R. 56 (E.D. Wis. 2010).

information about the fight that occurred in the kitchen, the plaintiff denied knowing anything. Id. at ¶¶12-13.

During an interview with another inmate, however, that inmate indicated that the plaintiff "was supposed to have been involved" in the kitchen altercation. Id. at ¶8. The other inmate's statements indicated that the plaintiff might be at risk of retaliation from other inmates, because he failed to actually participate in the altercation. Id. at ¶9. No other kitchen staff members were identified either as being security risks or being at risk; only the plaintiff "appeared to present a risk based on the investigation." Id. at ¶20.

Because the other inmate had connected the plaintiff to the kitchen altercation, Kartman believed that the plaintiff might have lied about being involved. Id. at ¶14. He also believed that the plaintiff would present a security threat if allowed to continue working in the kitchen, because the other inmate had reported that the plaintiff was involved in activity that threatened security and because the plaintiff was at risk of being attacked by other inmates in retaliation for "staying out of" the altercation. Id. at ¶15. So on June 14, 2016, Kartman issued the plaintiff a memorandum informing him that he was being removed from his kitchen work assignment. Id. at ¶16. The memo stated that the removal was a result of a completed investigation, which showed "that although [the plaintiff] was not directly involved in the kitchen altercation, evidence showed that [the plaintiff] 'played a role in and had significant information regarding the altercation.'" Id. at ¶17; Dkt. No. 34 at ¶12. The

plaintiff was the only inmate placed in temporary lock up status who did not eventually get his job back. Dkt. No. 22 at ¶20.

The plaintiff never received a conduct report for the kitchen incident. Dkt. No. 34 at ¶4. He says that no one told him that he was either a security threat or at risk for retaliation, and no one moved him to a safer place or placed him in protective custody. Id. at ¶20.

The plaintiff asserts that Kartman took his job. Id. at ¶7. The plaintiff says that Iverson "filled out a 1408[2] firing [the plaintiff] from his job," but that she had no right to do so. Dkt. No. 34 at ¶6. The defendants agree that Kartman, not Iverson, made the decision to remove the plaintiff from the job in the kitchen. Dkt. No. 22 at ¶22.

## II. SUMMARY JUDGMENT STANDARD

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); see also Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); Celotex Corp. v. Catrett, 477 U.S. 317, 324 (1986); Ames v. Home Depot U.S.A., Inc., 629 F.3d 665, 668 (7th Cir. 2011). "Material facts" are those under the applicable substantive law that "might affect the outcome of the suit." Anderson, 477 U.S. at 248. A dispute over a "material fact" is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Id.

---

[2] A DOC-1408 form is an Offender Work/Program/Placement form. See Dkt. No. 19-2 at 12.

4

A party asserting that a fact is or isn't disputed must support the assertion by:

> (A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or
>
> (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.

Fed. R. Civ. P. 56(c)(1). "An affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." Fed. R. Civ. P. 56(c)(4).

## III. DISCUSSION

The defendants contend that they are entitled to summary judgment on both the plaintiff's equal protection claim and his First Amendment retaliation claim. They also argue that the plaintiff has provided no evidence showing that defendant Iverson is liable for anything.

With regard to the equal protection claim, the defendants assert that the plaintiff was not terminated because of his race. They argue that there is no evidence that Kartman knew the plaintiff's race, because the plaintiff is listed as white in the DOC's computer system. They also assert that the other inmates who worked in the kitchen were not similarly situated to the plaintiff, because none of them had been implicated in the investigation or identified as being at risk.

5

With regard to the plaintiff's First Amendment retaliation claim, the defendants put forward three possible theories the plaintiff might be trying to pursue, and argue that he cannot state a constitutional claim under any of them. They argue that at best, the plaintiff states a claim that Kartman fired him because of an erroneous belief that the plaintiff knew facts about the kitchen altercation but refused to disclose them.

Finally, the defendants assert that the court should dismiss defendant Iverson, because the plaintiff has not presented any evidence of her involvement in the investigation or in the decision to fire him.

A. Claims against Defendant Iverson

"To recover damages under § 1983, a plaintiff must establish that a defendant was personally responsible for the deprivation of a constitutional right." Gentry v. Duckworth, 65 F.3d 555, 561 (7th Cir.1995) (citing Sheik-Abdi v. McClellan, 37 F.3d 1240, 1248 (7th Cir. 1994)). To survive summary judgment, the plaintiff must "offer some record evidence that . . . the defendant officials knew of a constitutional deprivation and approved it, turned a blind eye to it, failed to remedy it, or in some way personally participated." Johnson v. Snyder, 444 F.3d 579, 584 (7th Cir. 2006) (quoting Vance v. Peters, 97 F.3d 987, 994 (7th Cir.1996)).

In the complaint, the plaintiff alleged that defendant Iverson was the Food Service Administrator at WSPF. Dkt. No. 1 at ¶3. He alleged that "Ms. Iverson should not have filled out a 1408 firing Santos from his job and had no right under there [sic] own policy to do it." Id. at ¶21. He also made the general

6

assertion that Iverson "participated in violating" his rights. Id. at ¶23. The evidence in the record shows that on June 14, 2016, Kartman (the security director for WSPF) wrote the plaintiff the memo, telling him that he was being removed from the kitchen assignment because of the investigation. Dkt. No. 19-2 at 11. Kartman copied several people on the letter, including Ms. Iverson. Id. On July 20, 2016, Ms. Iverson signed off as the "Authorizing Signature" on the Offender Work/Program/Placement form that stated that the plaintiff was being removed from the position. Id. at 12. In the "comments" section of the form, someone typed, "Removed per Security." Id.

The facts do show that Iverson, the food administrator, signed the 1408 form. But they do not support the plaintiff's conclusion that Iverson fired him. The facts show that *Kartman*, as director of security, made the decision to remove the plaintiff from the kitchen job, and notified Iverson of that decision. Someone filled out the paperwork necessary to effectuate Kartman's decision, and Iverson signed it in her position as the administrator of the kitchen, but the paperwork shows that it was security—Kartman—who instructed the staff to remove the plaintiff from the position.

Even if the court were to find that the plaintiff had presented sufficient facts to show that his equal protection or First Amendment rights were violated, he has not presented evidence to show that Iverson was personally involved in those violations. The court will grant summary judgment in favor of Iverson.

A. Equal Protection claim against Kartman

The complaint alleges that Kartman discriminated against the plaintiff because he was Latino. Dkt. No. 1 at 4. Judge Duffin allowed the plaintiff to proceed on an equal protection claim.

The Due Process Clause of the Fourteenth Amendment prohibits states from depriving citizens of equal protection of the laws. It gives citizens the "right to be free from invidious discrimination in statutory classifications and other governmental activity." D.S. v. East Porter C'nty School Corp., 799 F.3d 793, 799 (7th Cir. 2015) (quoting Harris v. McRae, 448 U.S. 297, 322 (1980)). To assert an equal protection violation based on racial discrimination, the plaintiff "must establish that a state actor has treated him differently than persons of a different race and that the state actor did so purposefully." DeWalt v. Carter, 224 F.3d 607, 618 (7th Cir. 2000) (citations omitted). The plaintiff "must produce evidence showing that as a racial minority he was treated differently from similarly situated [non-minority] inmates and that the defendant acted with a discriminatory purpose or intent." Hill v. Thalacker, 399 F. Supp. 2d 925, 928 (W.D. Wis. 2005); see also, Lewis v. Jacks, 486 F.3d 1025, 1028 (8th Cir. 2007) ("Discriminatory purpose can be proved with various kinds of direct and circumstantial evidence but is most often proved with evidence that similarly situated inmates were treated differently.").

The plaintiff cannot succeed on his equal protection claim as a matter of law. Looking at the facts in the light most favorable to the plaintiff, as the court must at summary judgment: the plaintiff himself asserts that Kartman and

others "gather[ed] up all the Latinos that worked in the kitchen to see which ones were all in involved." Dkt. No. 34 at ¶19. He says that members of the Latin Folks gang received conduct reports relating to the assault in the kitchen area, dkt. no. 35 at ¶11, and that members of the Latin Folk are Latino, id. at ¶16. Yet, despite the fact that there were other Latinos working in the kitchen, and possibly involved in the assault incident, the plaintiff was the only Latino Kartman fired. These facts show that Kartman did not fire *Latinos* involved in the kitchen incident. He fired the plaintiff, who happens to be Latino. Had Kartman fired all the Latino kitchen workers involved in the incident, and *not* fired kitchen workers of other races, the plaintiff might have had the beginning of an equal protection claim; at least he might have had a basis for arguing that Kartman treated him and other Latinos differently than he treated similarly-situated non-Latinos. But the evidence does not show that Kartman treated Latino kitchen workers differently than he treated kitchen workers of other races.

What the evidence *does* show is that Kartman treated the plaintiff differently than he treated other kitchen workers, whatever their race. Kartman singled out the plaintiff for firing. It is possible for a plaintiff to allege a "class of one" equal protection claim. D.S., 799 F.3d at 799. To prove a class-of-one claim, a plaintiff must show that he was "intentionally treated differently from others similarly situated and that there is no rational basis for the difference in treatment." Id. (quoting Vill. of Willowbrook v. Olech, 528 U.S. 562, 564 (2000)). For the plaintiff to show that he is "similarly situated" to others, he

9

must show that he is "*prima facie* identical in all relevant respects or directly comparable . . . . in all material respects" to the others with whom he compares himself. Id. (quoting United States v. Moore, 543 F.3d 891, 896 (7th Cir. 2008)).

The evidence does not establish the elements of a class-of-one equal protection claim. First, the plaintiff has not shown that there were any others "similarly situated" to him. There were other Latino kitchen workers. But the plaintiff was the only one that Kartman believed (maybe mistakenly) had information about the incident that he refused to provide. That belief—even if wrong—caused Kartman to think that the plaintiff might pose a security risk. In addition, the investigation revealed that the plaintiff did not involve himself in the kitchen incident, which caused Kartman to believe (maybe mistakenly) that the plaintiff was at risk for retaliation by other inmates. The plaintiff has not identified any other inmates who (a) Kartman believed knew about the incident but didn't reveal what they knew, and (b) refused to participate in the incident and so were at risk for retaliation from other inmates. Without evidence showing that there was a similarly-situated group of kitchen workers who Kartman did not fire, the plaintiff cannot prove a class-of-one claim against Kartman.

Because the plaintiff has not shown that Kartman fired him because he was Latino, and because he has not shown that Kartman treated him differently than other similarly-situated individuals with no rational basis for that treatment, the court must grant summary judgment in favor of Kartman

on the plaintiff's Fourteenth Amendment equal protection claim.

B.  First Amendment Retaliation Claim Against Kartman

The plaintiff alleged in the complaint that Kartman retaliated against him because the plaintiff would not tell the staff who investigated the kitchen incident what they thought he knew. Dkt. No. 1 at 4.

The First Amendment prohibits Congress from making laws that abridge freedom of speech. The plaintiff does not allege that Kartman denied him his right to speak. In fact, the plaintiff *did* speak. The plaintiff asserts that after the kitchen workers were placed in temporary lock up, he was questioned by Captains Gardner and Brown. Id. at ¶¶7, 8. Gardner and Brown asked the plaintiff how he knew some of the inmates involved in the altercation; the plaintiff responded "that he knew the inmates some of who had been taken to segregation from being on the range with them on Echo Unit and because they all worked together in the kitchen." Id. at ¶7. The plaintiff asserts that the captains "pressured" him, asking how he knew the inmates that were fighting, because the captains had seen those inmates talking when the captains had reviewed the camera footage. Id. at ¶8. The plaintiff's response was the same, and Brown replied, "if you are lying you'll pay." Id. The defendants indicate that the plaintiff was asked—they do not say by whom—if he had any "information about the fight that occurred in the kitchen." Dkt. No. 22 at ¶12. They say the plaintiff "denied any such knowledge." Id. at ¶13. The court does not see much of a distinction between the plaintiff's and the defendants' versions of what the plaintiff said in the interviews.

11

The plaintiff alleges that Kartman took his kitchen job in retaliation for his denial that he knew anything about the kitchen altercation. For a plaintiff to show that a state defendant retaliated against him in violation of his right to free speech, he must show that "'(1) he engaged in activity protected by the First Amendment; (2) he suffered a deprivation that would likely deter First Amendment activity in the future'; and (3) a causal connection existed between the two." Watkins v. Kasper, 599 F.3d 791, 794 (7th Cir. 2010) (quoting Bridges v. Gilbert, 557 F.3d 541, 546 (7th Cir. 2009)). The plaintiff does not have to show that retaliation was the only factor that motivated the defendants, but he must show that it was a motivating factor. See Woodruff v. Mason, 542 F.3d 545, 551 (7th Cir. 2008) (citing Spiegla v. Hull, 371 F.3d 928, 942 (7th Cir. 2004)).

The plaintiff has alleged that he exercised his First Amendment right to speak (saying he didn't know anything about the kitchen incident). The plaintiff has alleged that, based on what he said, Kartman took an action (taking the kitchen job). (While the plaintiff has not specifically alleged that losing one's prison job might chill one from exercising one's First Amendment rights in the future, the court will assume as much for the purposes of summary judgment.) And the plaintiff has alleged that Kartman's reason for taking that action was that Kartman did not believe what the plaintiff said. If the analysis stopped there, it would appear as though the plaintiff had made out a *prima facie* case for retaliation.

The analysis, however, does not stop there. The reason Kartman did not

believe the plaintiff was because another inmate stated that (a) the plaintiff *did* have information about the kitchen altercation (even though the plaintiff did not actually participate), and (b) the plaintiff might be at risk from other inmates who did participate. Kartman indicates that, based on the other inmate's statements, Kartman believed that "[the plaintiff] may have falsely denied any involvement during the plaintiff's interview." Dkt. No. 22 at ¶14. If the plaintiff *had* been involved in planning the kitchen fight, or if he did have information about who planned it or how it started, but lied about it, that lie could pose a threat to prison security. Such a lie could make it harder for the security staff to figure out what happened, and harder to prevent future fights. Such a lie could imply that the plaintiff was trying to protect the inmates who were involved, or to protect himself, or to hide any future plans.

Similarly, if the other inmate was right that the plaintiff himself was at risk from inmates who might want to punish him for not participating in the fight, *that* would pose a risk to prison security. If other inmates believed they had reason to punish the plaintiff, they might plan or start another fight, which could put them, the plaintiff and prison staff at risk.

These facts—the fact that Kartman believed (right or wrong) that the plaintiff was lying about a security issue, and that the plaintiff's failure to participate in the fight might pose a security risk—change the First Amendment analysis. This is because of the unique challenges posed by a prison setting. Prisoners, like anyone else, have constitutional rights that federal courts must recognize. See Turner v. Safley, 482 U.S. 78, 84 (1987)

13

(citing Procunier v. Martinez, 416 U.S. 396, 405 (1974)). At the same time, "[r]unning a prison is an inordinately difficult undertaking that requires expertise, planning, and the commitment of resources, all of which are peculiarly within the province of the legislative and executive branches of government." Id. at 84-85. When a court analyzes a prisoner's claim that a member of the prison staff may have violated his constitutional rights, that court must consider both "the policy of judicial restraint regarding prisoner complaints and . . . the need to protect constitutional rights." Id. at 85 (quoting Procunier, 416 U.S. at 406. In striking this balance, the Supreme Court has held that "when a prison regulation impinges on inmates' constitutional rights, the regulation is valid if it is reasonably related to legitimate penological interests." Id. at 89.

In deciding whether a prison regulation is reasonably related to legitimate penological interests, a lower court must determine whether there is a "valid, rational connection" between the regulation and the government's interest; whether there are alternative means of exercising their rights open to inmates; the impact accommodating the prisoner's right will have on other inmates; and whether there are any "ready alternatives" to the action that deprived the prisoner of his rights. Id. at 89-90.

Here, the "regulation"—the government action—was Kartman removing the plaintiff from his kitchen job. The legitimate penological interest, Kartman claims, was prison security. The Supreme Court has held that "maintaining institutional security and preserving internal order and discipline are essential

goals that may require limitation or retraction of the retained constitutional rights of both convicted prisoners and pretrial detainees." Bell v. Wolfish, 441 U.S. 520, 546 (1979). So the court first must ask—did Kartman's removal of the plaintiff from his kitchen job have a "valid, rational connection" to the legitimate penological interest of security? The answer is yes.

The fight took place in the kitchen, among kitchen workers. The plaintiff was a kitchen worker. While the plaintiff indicated that he didn't know anything about the fight, Kartman had information from another inmate to the contrary (as well as information that the plaintiff might be the target of retaliation by other inmates). The plaintiff was the only kitchen worker who did not get his job back after the investigation, and that was because he was the only one the investigation revealed might either be a security risk or be at risk. Taking the plaintiff out of the place where he was at risk, or posed a risk, had a valid, rational connection to prison security.

As for whether the plaintiff had other ways to exercise his right to free speech, the court notes again that he *did* exercise his right to free speech. He said he didn't know anything about the kitchen incident. Perhaps the plaintiff is trying to argue that he had a First Amendment right *not* to speak about the kitchen incident. At least one court has held that there is some question as to whether the First Amendment protects someone's refusal to speak. See Clark v. Gipson, No. 13-CV-3012, 2015 WL 328966, at *5-*6 (C.D. Ill. 2015). And that court held that even if the First Amendment does protect a person's right to refuse to speak, "the right does not extend to refusing to act as an informant as

15

a condition of receiving a prison job." Id. at *5. While the plaintiff cited the Clark decision, it supports Kartman's argument instead.

Had Kartman accommodated the plaintiff—given him back his kitchen job—it may have had an impact both on the plaintiff and on other inmates. If there were kitchen workers who were angry that the plaintiff did not participate in the fight, those workers could have taken action against the plaintiff in the kitchen. If they had—if another fight had broken out—it could have risked the plaintiff's security, the security of other inmates and the security of staff.

Finally, the court cannot conceive of a ready alternative available to protect the plaintiff's security and that of others. Kartman could have removed everyone except the plaintiff from the kitchen jobs. That would have meant no staff in the kitchen. The plaintiff asserts that security staff never told him he might be at risk. It is not clear what the plaintiff could have done to protect himself had he returned to the kitchen job knowing that he was at risk. And even if he could have protected himself, that would not address the risk to other inmates and to the staff.

The court has analyzed the plaintiff's claim as a First Amendment retaliation claim. But what the plaintiff really argues is that Kartman violated his rights by not believing the plaintiff's statement that he did not know anything about the kitchen incident, and instead believing the other inmate. The court has found no case that says that an inmate has right to have prison staff believe what he says.

The court understands that the plaintiff feels that Kartman believed

16

something about him that may not have been true, and that he removed the plaintiff from the kitchen job because of that mistaken belief. The plaintiff may well be right. Maybe the plaintiff knew absolutely nothing about plans for the kitchen assault, or the assault itself, and was as surprised as anyone when it happened. Perhaps he really did not have anything he could tell the investigators about the incident. Maybe he wasn't at risk from other inmates, and did not pose any security risk himself. But firing someone because you received erroneous information about whether they posed a security risk is not a constitutional violation. It is a mistake, and a mistake does not violate the Constitution. The court will grant summary judgment in favor of Kartman on the First Amendment retaliation claim.

### III. CONCLUSION

The court **GRANTS** the defendants' motion for summary judgment. Dkt. No. 20.

The court **ORDERS** that the case is **DISMISSED**. The clerk shall enter judgment accordingly.

This order and the judgment to follow are final. A dissatisfied party may appeal this court's decision to the Court of Appeals for the Seventh Circuit by filing in this court a notice of appeal within **30 days** of the entry of judgment. See Federal Rule of Appellate Procedure 3, 4. This court may extend this deadline if a party timely requests an extension and shows good cause or excusable neglect for not being able to meet the 30-day deadline. See Federal Rule of Appellate Procedure 4(a)(5)(A).

Under certain circumstances, a party may ask this court to alter or amend its judgment under Federal Rule of Civil Procedure 59(e) or ask for relief from judgment under Federal Rule of Civil Procedure 60(b). Any motion under Federal Rule of Civil Procedure 59(e) must be filed within **28 days** of the entry of judgment. The court cannot extend this deadline. See Federal Rule of Civil Procedure 6(b)(2). Any motion under Federal Rule of Civil Procedure 60(b) must be filed within a reasonable time, generally no more than one year after the entry of the judgment. The court cannot extend this deadline. See Federal Rule of Civil Procedure 6(b)(2).

The court expects parties to closely review all applicable rules and determine, what, if any, further action is appropriate in a case.

Dated in Milwaukee, Wisconsin this 16th day of March, 2018.

BY THE COURT:

_____
**HON. PAMELA PEPPER**
**United States District Judge**
